FILED

2013 NOV 14  PM 3: 01

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY _____

1  ROBBINS ARROYO LLP
   BRIAN J. ROBBINS (190264)
2  brobbins@robbinsarroyo.com
   CRAIG W. SMITH (164886)
3  csmith@robbinsarroyo.com
   SHANE P. SANDERS (237146)
4  ssanders@robbinsarroyo.com
   JULIA M. WILLIAMS (244400)
5  jwilliams@robbinsarroyo.com
   600 B Street, Suite 1900
6  San Diego, CA 92101
   Telephone:  (619) 525-3990
7  Facsimile: (619) 525-3991

8  Attorneys for Plaintiff

9  [Additional Counsel on Signature Page]

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12                    SOUTHERN DIVISION

13  CHAILE STEINBERG, Derivatively      )  Case No.   **SACV13-01797 RNB**
    on Behalf of CORINTHIAN             )
14  COLLEGES, INC.,                     )
                                        )
15                  Plaintiff,          )  VERIFIED SHAREHOLDER
                                        )  DERIVATIVE COMPLAINT FOR
16           v.                         )  BREACH OF FIDUCIARY DUTY,
                                        )  WASTE OF CORPORATE ASSETS,
17  JACK D. MASSIMINO, KENNETH          )  AND UNJUST ENRICHMENT
    S. ORD, ROBERT D. BOSIC, BETH       )
18  A. WILSON, PAUL R. ST. PIERRE,      )
    TERRY O. HARTSHORN, HANK            )
19  ADLER, ROBERT LEE, ALICE T.         )
    KANE, JOHN M. DIONISIO,             )
20  LINDA AREY SKLADANY,                )
    TIMOTHY J. SULLIVAN,                )
21  SHARON P. ROBINSON, and             )
    MARC H. MORIAL,                     )
22                                      )
                    Defendants,         )
23           -and-                      )
                                        )
24  CORINTHIAN COLLEGES, INC., a        )
    Delaware corporation,               )
25                                      )
                Nominal Defendant.      )
26  _____)  DEMAND FOR JURY TRIAL

27

28

## NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder derivative action brought by plaintiff on behalf of nominal defendant Corinthian Colleges, Inc. ("Corinthian" or the "Company") against certain of its officers and directors.  The Individual Defendants (as defined herein) harmed the Company by causing it to violate applicable law concerning the recruitment of students, including, but not limited to, disseminating inflated job placement rates and manipulating loan repayment rates.  Further, the practices implemented by the Individual Defendants have caused the Company to come perilously close, if not violate, regulations under Title IV of the Higher Education Act ("HEA"), 20 U.S.C. §1720, *et seq*. ("Title IV"), the source of over 80% of the Company's tuition revenue.  Compounding their breaches of fiduciary duty, the Individual Defendants covered their actions by making and having Corinthian make misleading statements to the public.  These violations have cost the Company hundreds of millions of dollars and subjected it to costly lawsuits, including a securities fraud class action.

2.     Corinthian provides various for-profit educational programs and services.  Corinthian is one of the largest for-profit post-secondary education companies in the United States and Canada with more than 81,000 students in more than 100 schools.  These schools receive over 80% of their tuition revenue from Title IV programs.  Institutions receiving Title IV funding are required to adhere to certain regulations concerning advertising, promotional practices, and the manner in which prospective students are recruited.  In addition, in order to receive Title IV funding, educational institutions must be accredited.  To maintain accreditation, schools must place at least 65 to 70% of their graduating students in jobs for which their studies prepared them.[1]

_____

[1]  The majority of Corinthian's campuses are accredited by the Accrediting Commission of Career Schools and Colleges ("ACCSC") and/or the Accrediting

3.      The Company's job placement metrics are also highly material to the Company's potential students who consider attending the college based upon gaining the necessary skills to find a position that will launch them on a successful career.  In light of the above, it is unsurprising that the Company's Chief Executive Officer ("CEO") describes the job placement rate for Corinthian graduates as "the most important metric in the Company."

4.      The Company has a long history of issuing misleading statements about the Company's job placement rates and other "gainful employment" data.  In or about 2004, the Attorney General of the State of California began investigating two of the Company's wholly-owned subsidiaries concerning Corinthian's repeated misrepresentations of job placement rates.   The California Attorney General eventually brought an action against Corinthian's subsidiaries (the "2007 AG Action"), and in July 2007, the Superior Court of the State of California for the County of Los Angeles entered a final judgment for the 2007 AG Action.  Among other things, the court *permanently enjoined* the Company from making or causing to be made any untrue or misleading statement about the employment or salaries that students will or may obtain after enrolling in or completing any of Corinthian's programs, or failing to provide prospective students with truthful information concerning former students employment, completion rates, and salaries.

---

Council for Independent Colleges and Schools ("ACICS"). Both accreditors require schools to meet minimum placement rates by school and by program. The ACCSC "Established Benchmark Employment Rate" is 70% and the ACICS standard is 65%.  Where Corinthian's job placement rate as a company falls relative to the 65% and 70% requirements set by ACCSC and ACICS is therefore indicative of Corinthian's ability to keep its campuses accredited and, relatedly, its ability to access federal funds.

SHAREHOLDER DERIVATIVE COMPLAINT

5.      In response to the 2007 AG Action and other actions against Corinthian and its subsidiaries, the Company created a Compliance Committee and instituted numerous corporate reforms that were purportedly designed to: (i) enhance the Company's auditing practices; (ii) prevent the dissemination of misleading statements; and (iii) ensure that the Company's Board of Directors (the "Board") receives relevant information concerning the Company's business practices.

6.      In spite of the above, a 2013 investigation by the California Attorney General uncovered internal and external Company audits that revealed, among other things: (i) job placement reporting error rates as high as 50%-70%; (ii) files with missing job placement documents; (iii) missing signatures in student employment verifications; (iv) backdating of signatures on job placement files; and (v) self-employment related documents that purported to be provided by the Company's graduates but were in fact created by Corinthian.   The California Attorney General also found that the Company's disclosures for "all campuses in California and online campuses does not match or agree with the data in [Corinthian's] own database systems and/or in student files," and that "[i]n numerous cases, the placement rate data in [Corinthian's] files [where available] shows that the placement rate is lower than the advertised rate."

7.      In addition to overstating its job placement metrics, the Company has repeatedly failed to implement measures to address Corinthian's high student loan default rates.   Instead, the Individual Defendants caused or allowed the Company to manipulate federal student loan and grant programs in order to appear to be in compliance with federal regulations.   In fact, recent investigations by Senator Tom Harkin, Chairman of the Health, Education, Labor and Pensions Committee, found that the Company aggressively pushes students into deferment or forbearance in attempt to ensure that students default outside of the statutory window in which the United States Department of Education ("Department of Education") monitors

- 3 -

1  defaults.  The Company implements this tactic without regard to the best financial
2  interest of the students, and often forces students to pay more over the life of the
3  loan.  This scheme, combined with Corinthian students' inability to find gainful
4  employment after graduation has led to ***default rates for Corinthian students that***
5  ***are 64% higher than the rates for all for-profit colleges***.  As a result, due to
6  various federal loan program eligibility requirements, the Company is at risk of
7  losing its eligibility for federal financial aid.

8       8.    The Company's improper business practices and inflated job
9  placement rates rendered its contemporaneous public statements concerning its
10  regulatory compliance misleading.  As a result, the Company has faced numerous
11  state and federal investigations, including investigations by the United States
12  Consumer Financial Protection Bureau, the United States Government
13  Accountability Office ("GAO"), the United States Securities and Exchange
14  Commission (the "SEC"), and the Attorney Generals' Offices for the states of
15  California, Massachusetts, Georgia, New York, Oregon, and Illinois.   The
16  Company is also now subject to at least one securities fraud class action, multiple
17  student class actions brought by former students, and an action for civil penalties
18  and a permanent injunction by the California Attorney General.

19                 **JURISDICTION AND VENUE**

20       9.    This Court has jurisdiction over all causes of action asserted herein
21  pursuant to 28 U.S.C. §1332(a)(2) in that plaintiff and defendants are citizens of
22  different states and the amount in controversy exceeds $75,000, exclusive of
23  interest and costs.  This action is not a collusive action designed to confer
24  jurisdiction on a court of the United States that it would not otherwise have.

25      10.    This Court has jurisdiction over each defendant named herein because
26  each defendant is either a corporation that conducts business in and maintains
27  operations in this District, or is an individual who has sufficient minimum contacts

28

SHAREHOLDER DERIVATIVE COMPLAINT

1   with this District so as to render the exercise of jurisdiction by the District courts

2   permissible under traditional notions of fair play and substantial justice.

3       11.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because:

4   (i) Corinthian maintains its principal place of business in this District; (ii) one or

5   more of the defendants either resides in or maintains executive offices in this

6   District; (iii) a substantial portion of the transactions and wrongs complained of

7   herein, including the defendants' primary participation in the wrongful acts detailed

8   herein, and aiding and abetting and conspiracy in violation of fiduciary duties

9   owed to Corinthian, occurred in this District; and (iv) defendants have received

10  substantial compensation in this District by doing business here and engaging in

11  numerous activities that had an effect in this District.

12                          **THE PARTIES**

13  **Plaintiff**

14      12.    Plaintiff Chaile Steinberg was a shareholder of Corinthian at the time

15  of the wrongdoing complained of, has continuously been a shareholder since that

16  time, and is a current Corinthian shareholder.  Plaintiff is a citizen of Pennsylvania.

17  **Nominal Defendant**

18      13.    Nominal defendant Corinthian is a Delaware corporation with

19  principal executive offices located at 6 Hutton Centre Drive, Suite 400, Santa Ana,

20  California.   Accordingly, Corinthian is a citizen of Delaware and California.

21  Corinthian is one of the largest for-profit post-secondary education companies in

22  the United States and Canada, serving people who want to acquire career-oriented

23  education.  Corinthian offers various diploma programs and associate, bachelor's

24  and master's degrees.  The Company's training program areas include healthcare,

25  criminal justice, business, mechanical, trades, and information technology.  As of

26  June 30, 2013, Corinthian operated 111 colleges with 81,284 students in twenty-

27  five states and the province of Ontario, Canada.

28

SHAREHOLDER DERIVATIVE COMPLAINT

**Defendants**

14.     Defendant Jack D. Massimino ("Massimino") is Corinthian's Chairman of the Board and CEO and has been since November 2010 and a director and has been since 1999.  Defendant Massimino was also Corinthian's Executive Chairman from July 2009 to November 2010, Chairman of the Board from August 2008 to June 2009, and CEO from November 2004 to July 2009.  Defendant Massimino knowingly, recklessly, or with gross negligence made misleading statements in the Company's press releases and public filings concerning the Company's: (i) job placement rates; and (ii) compliance with various regulations. Corinthian paid defendant Massimino the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------------|--------------|----------------------------|----------------------|-------|
| 2013 | $900,000 | $711,900 | $1,007,307 | $307,395 | $91,257 | $3,017,859 |
| 2012 | $900,000 | $425,250 | $487,845 | $1,300,219 | $77,830 | $3,191,144 |
| 2011 | $871,291 | $443,756 | $1,516,524 | $517,500 | $64,372 | $3,413,443 |

Defendant Massimino is a citizen of Utah.

15.     Defendant Kenneth S. Ord ("Ord") is Corinthian's Chief Administrative Officer and has been since December 2010 and an Executive Vice President and has been since February 2005.  Defendant Ord was also Corinthian's Chief Financial Officer ("CFO") from February 2005 to December 2010. Defendant Ord knowingly, recklessly, or with gross negligence caused or allowed the Company to make misleading statements in the Company's press releases and public filings concerning the Company's: (i) job placement rates; and (ii) compliance with various regulations.  Corinthian paid defendant Ord the following compensation as an executive:

SHAREHOLDER DERIVATIVE COMPLAINT

| Year | Salary | Stock Awards | Option Awards | Incentive Plan Compensa-tion | All Other Compensation | Total |
|------|--------|--------------|---------------|------------------------------|------------------------|-------|
| 2013 | $530,450 | $137,865 | $195,072 | $141,789 | $26,521 | $1,031,697 |
| 2012 | $515,000 | $79,955 | $91,722 | $582,272 | $26,942 | $1,295,891 |
| 2011 | $479,934 | $90,859 | $225,793 | $193,125 | $25,538 | $1,015,249 |

Defendant Ord is a citizen of California.

16.     Defendant Robert D. Bosic ("Bosic") is Corinthian's Executive Vice President, Operations and has been since January 2011.  Defendant Bosic was also Corinthian's Group and Division President of the West Division of Corinthian from June 2009 to January 2011, and served in various other positions within Corinthian for eight years, including General Manager, Regional Vice President of Operations for the Southwest Region, and Campus President at Everest Houston Greenspoint.  Defendant Bosic knowingly or recklessly caused or allowed the Company to make misleading statements in the Company's press releases and public filings concerning the Company's: (i) job placement rates; and (ii) compliance with various regulations.  Defendant Bosic is a citizen of California.

17.     Defendant Beth A. Wilson ("Wilson") is an Executive Vice President of Corinthian and has been since July 2001.  She is responsible for overseeing all operational support for accreditation and licensure, curriculum development and quality control, employer development, financial aid, and facilities.  Defendant Wilson was also Corinthian's Vice President of Operations from June 1998 to June 2001; Regional Operations Director for Rhodes Colleges, Inc. from May 1998 to June 1998; and Operations Director and Regional Operations Director for Corinthian Schools, Inc. from July 1995 to May 1997.  Defendant Wilson knowingly, recklessly, or with gross negligence caused or allowed the Company to make misleading statements in the Company's press releases and public filings concerning the Company's: (i) job placement rates; and (ii) compliance with

SHAREHOLDER DERIVATIVE COMPLAINT

various regulations.  Corinthian paid defendant Wilson the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|-----------------------------|------------------------|-------|
| 2013 | $451,140 | $117,251 | $165,905 | $100,491 | $42,999 | $877,786 |
| 2012 | $438,000 | $68,000 | $78,009 | $412,678 | $43,382 | $1,040,069 |
| 2011 | $425,000 | $84,865 | $210,905 | $164,250 | $40,931 | $925,951 |

Defendant Wilson is a citizen of California.

18.    Defendant Paul R. St. Pierre ("St. Pierre") is Corinthian's Vice Chairman of the Board and has been since January 2003 and a director and has been since July 1995.  Defendant St. Pierre was also Corinthian's Executive Vice President, Marketing & Admissions from April 1998 to June 2003 and Vice President, Marketing & Admissions from July 1995 to April 1998.  Defendant St. Pierre is a member of Corinthian's Compliance Committee and has been since October 2009.   Defendant St. Pierre is one of the founders of Corinthian. Defendant St. Pierre knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) job placement rates; and (ii) compliance with various regulations.   Corinthian paid defendant St. Pierre the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2013 | $83,000 | $72,459 | $155,459 |
| 2012 | $86,000 | $40,350 | $126,350 |
| 2011 | $76,500 | $64,500 | $141,000 |

Defendant St. Pierre is a citizen of California.

19.    Defendant Terry O. Hartshorn ("Hartshorn") is Corinthian's Lead Independent Director and has been since August 2008 and a director and has been since September 2005.  Defendant Hartshorn was also Corinthian's Chairman of the Board from December 2006 to August 2008.   Defendant Hartshorn is a member of Corinthian's Audit Committee and has been since at least October 2010.

- 8 -

Defendant Hartshorn knowingly or recklessly made misleading statements in the Company's press releases and public filings concerning the Company's: (i) job placement rates; and (ii) compliance with various regulations.   Corinthian paid defendant Hartshorn the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2013 | $81,500 | $96,612 | $178,112 |
| 2012 | $84,500 | $53,800 | $138,300 |
| 2011 | $76,500 | $86,000 | $162,500 |

Defendant Hartshorn is a citizen of California.

20. Defendant Hank Adler ("Adler") is a Corinthian director and has been since August 2004.   Defendant Adler is also Chairman of Corinthian's Audit Committee and a member of the Compliance Committee and has been since at least October 2010.   Defendant Adler knowingly or recklessly made misleading statements in the Company's press releases and public filings concerning the Company's: (i) job placement rates; and (ii) compliance with various regulations. Corinthian paid defendant Adler the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2013 | $98,000 | $72,459 | $170,459 |
| 2012 | $101,000 | $40,350 | $141,350 |
| 2011 | $91,250 | $64,500 | $155,750 |

Defendant Adler is a citizen of California.

21. Defendant Robert Lee ("Lee") is a Corinthian director and has been since November 2006.   Defendant Lee is also a member of Corinthian's Audit Committee and Chairman of the Compliance Committee and has been since at least October 2010.   Defendant Lee knowingly or recklessly made misleading statements in the Company's press releases and public filings concerning the Company's: (i) job placement rates; and (ii) compliance with various regulations. Corinthian paid defendant Lee the following compensation as a director:

SHAREHOLDER DERIVATIVE COMPLAINT

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2013 | $93,000 | $72,459 | $165,459 |
| 2012 | $96,000 | $40,350 | $136,350 |
| 2011 | $87,500 | $64,500 | $152,000 |

Defendant Lee is a citizen of California.

22.     Defendant Alice T. Kane ("Kane") is a Corinthian director and has been since July 2005.   Defendant Kane is also a member of Corinthian's Compliance Committee and has been since at least October 2010.  Defendant Kane knowingly or recklessly made misleading statements in the Company's press releases and public filings concerning the Company's: (i) job placement rates; and (ii) compliance with various regulations.   Corinthian paid defendant Kane the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2013 | $99,500 | $72,459 | $171,959 |
| 2012 | $107,000 | $40,350 | $147,350 |
| 2011 | $98,250 | $64,500 | $162,750 |

Defendant Kane is a citizen of New York.

23.     Defendant John M. Dionisio ("Dionisio") is a Corinthian director and has been since April 2008.  Defendant Dionisio is also a member of Corinthian's Audit Committee and has been since at least October 2010.   Defendant Dionisio knowingly or recklessly made misleading statements in the Company's press releases and public filings concerning the Company's: (i) job placement rates; and (ii) compliance with various regulations.   Corinthian paid defendant Dionisio the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|-------------------|--------------|-------|
| 2013 | $81,500 | $72,459 | $153,959 |
| 2012 | $92,000 | $40,350 | $132,350 |
| 2011 | $79,500 | $64,500 | $144,000 |

SHAREHOLDER DERIVATIVE COMPLAINT

1     Defendant Dionisio is a citizen of New York.

2        24.    Defendant Linda Arey Skladany ("Skladany") is a Corinthian director

3 and has been since February 1999.  Defendant Skaldany knowingly or recklessly

4 made misleading statements in the Company's press releases and public filings

5 concerning the Company's: (i) job placement rates; and (ii) compliance with

6 various regulations.    Corinthian paid defendant Skladany the following

7 compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2013 | $78,000 | $72,459 | $150,459 |
| 2012 | $81,000 | $40,350 | $121,350 |
| 2011 | $79,250 | $64,500 | $143,750 |

12 Defendant Skladany is a citizen of Virginia.

13        25.    Defendant Timothy J. Sullivan ("Sullivan") is a Corinthian director

14 and has been since January 2008.  Defendant Sullivan knowingly or recklessly

15 made misleading statements in the Company's press releases and public filings

16 concerning the Company's: (i) job placement rates; and (ii) compliance with

17 various regulations.    Corinthian paid defendant Sullivan the following

18 compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2013 | $84,500 | $72,459 | $156,959 |
| 2012 | $93,500 | $40,350 | $133,850 |
| 2011 | $79,000 | $64,500 | $143,500 |

22 Defendant Sullivan is a citizen of Virginia.

23        26.    Defendant Sharon P. Robinson ("Robinson") is a Corinthian director

24 and has been since January 2011.  Defendant Robinson knowingly or recklessly

25 made misleading statements in the Company's press releases and public filings

26 concerning the Company's: (i) job placement rates; and (ii) compliance with

SHAREHOLDER DERIVATIVE COMPLAINT

various regulations.     Corinthian paid defendant Robinson the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2013 | $73,000 | $72,459 | $145,459 |
| 2012 | $67,500 | $40,350 | $107,850 |
| 2011 | $30,000 | $72,300 | $102,300 |

Defendant Robinson is a citizen of the District of Columbia.

27.     Defendant Marc H. Morial ("Morial") is a Corinthian director and has been since April 2013.     Defendant Morial knowingly or recklessly made misleading statements in the Company's press releases and public filings concerning the Company's: (i) job placement rates; and (ii) compliance with various regulations.  Corinthian paid defendant Morial the following compensation as a director:

| Year | Fees Paid in Cash | Stock Awards | Total |
|------|------|------|------|
| 2013 | $15,000 | $46,433 | $61,433 |

Defendant Morial is a citizen of New Jersey.

28.     The defendants identified in ¶¶14-17 are referred to herein as the "Officer Defendants."   The defendants identified in ¶¶14, 18-27 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶19-21, 23 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶18, 20-22 are referred to herein as the "Compliance Committee Defendants." Collectively, the defendants identified in ¶¶14-27 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### Fiduciary Duties

29.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Corinthian and its shareholders

fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Corinthian in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Corinthian and not in furtherance of their personal interest or benefit.

30.    To discharge their duties, the officers and directors of Corinthian were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Corinthian were required to, among other things:

(a)    properly and accurately guide shareholders and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(b)    conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    ensure that no inaccurate financial information about Corinthian was released to the public that would tend to artificially inflate Corinthian's stock or that would cause corresponding or greater harm to the Company's value when the truth was revealed;

(d)    ensure that there were sufficient checks, balances, and controls in Corinthian's accounting, finance, and operational functions, and related functions, to prevent accounting irregularities, internal control problems, and/or overstatement of financial prospects;

SHAREHOLDER DERIVATIVE COMPLAINT

1          (e)    properly and accurately guide shareholders and analysts as to

2 the true financial condition of the Company at any given time, including making

3 accurate statements about the Company's financial results and prospects, and

4 ensuring that the Company maintained an adequate system of financial controls

5 such that the Company's financial reporting would be true and accurate at all times;

6 and

7          (f)    remain informed as to how Corinthian conducts its operations

8 and, upon receipt of notice or information of imprudent or unsound conditions or

9 practices, make reasonable inquiry in connection therewith and take steps to

10 correct such conditions or practices and make such disclosures as necessary to

11 comply with applicable laws.

12 **Additional Duties of the Audit Committee Defendants**

13      31.    In addition to these duties, under its Charter, as amended and restated

14 in August 2009, the Audit Committee Defendants, defendants Adler, Dionisio,

15 Hartshorn, and Lee, owed specific duties to Corinthian to assist the Board in

16 overseeing: (i) the financial reports and other financial information provided by the

17 Company to any governmental body or the public; (ii) the Company's systems of

18 internal controls regarding finance, accounting, legal compliance, and ethics; and

19 (iii) the Company's auditing, accounting and financial reporting processes.

20 Moreover the Audit Committee's Charter provides that the Audit Committee "shall

21 encourage continuous improvement of, and foster adherence to, the [Company's]

22 policies, procedures and practices at all levels." In relevant part, the Audit

23 Committee Charter provides that the Audit Committee is further required to:

24      *Documents/Reports Review*

25                  * * *

26      (3)    Review with financial management and the independent

27             accountants the financial information to be included in any

28

Forms 10-K and 10-Q prior to their filing or prior to the release of earnings.

\* \* \*

*Internal Audit Function*

(10)  Review the budget, qualifications, activities, effectiveness and organizational structure of the internal audit function and the performance, appointment and replacement of the lead internal auditor.

*Financial Reporting Processes*

(11)  In consultation with the independent accountants and the internal auditors, review the integrity of the organization's financial reporting processes, both internal and external.

\* \* \*

*Process Improvement*

(14)  Establish regular and separate systems of reporting to the Committee by each of management, the independent accountants and the internal auditors regarding any significant judgments made in management's preparation of the financial statements and the view of each as to appropriateness of such judgments.

\* \* \*

*Ethical and Legal Compliance*

\* \* \*

(19)  Review management's monitoring of the [Company's] compliance with the [Company's] Code of Ethics, and ensure that management has the proper review system in place to ensure that [Company's] financial statements, reports and other

- 15 -

SHAREHOLDER DERIVATIVE COMPLAINT

financial   information   disseminated   to   governmental organizations, and the public satisfy legal requirements.

32.    The Audit Committee is required to meet at least four times annually and report the records of its meeting to the Board.

**Additional Duties of the Compliance Committee Defendants**

33.    In addition to these duties, under its Charter, in effect since at least April 16, 2009, the Compliance Committee Defendants, defendants Adler, Kane, Lee, and St. Pierre, owed specific duties to Corinthian to assist the Board in "fulfilling its corporate governance and oversight responsibilities in relation to the Company's regulatory compliance obligations." In particular, among other things, the Compliance Committee was required:

(1)    To serve as an independent and objective party to monitor the Company's compliance strategies and outcomes.

(2)    To provide an open avenue of communication among the Company's employees, senior management and the Board.

(3)    To review Company processes to ensure that an appropriate framework of policies, procedures, internal controls, reporting, ethical standards and employee accountability is established to achieve regulatory and legal compliance. This includes reviewing with management the appropriate allocation of resources to achieve the desired results.

(4)    To review the regular internal reports prepared by appropriate Company departments charged with monitoring and overseeing the Company's compliance efforts.

- 16 -

SHAREHOLDER DERIVATIVE COMPLAINT

> (5) To regularly meet with Company management charged with overseeing the Company's compliance efforts, including, without limitation, the [CEO] and other members of the Board who are also executive officers of the Company.
>
> (6) To review the Company's efforts to nurture a culture of compliance and embed compliance awareness and accountability throughout the Company.

34. The Compliance Committee is required to meet at least four times annually and report the records of its meetings to the Board.

**Breaches of Duties**

35. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Corinthian, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

36. The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to violate applicable federal and state laws and regulations.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  In addition, as a result of the defendants' illegal actions and course of conduct, Corinthian is now the subject of numerous government investigations, multiple lawsuits filed on behalf of students misled by the Company's improper recruiting practices, and a securities class action lawsuit.  As a result, Corinthian has expended, and will continue to expend, significant sums of money.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

37. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct,

- 17 -

1    and have acted in concert with and conspired with one another in furtherance of
2    their common plan or design.  In addition to the wrongful conduct herein alleged as
3    giving rise to primary liability, the Individual Defendants further aided and abetted
4    and/or assisted each other in breaching their respective duties.

5         38.    During all times relevant hereto, the Individual Defendants,
6    collectively and individually, initiated a course of conduct that was designed to and
7    did: (i) deceive the investing public, including shareholders of Corinthian,
8    regarding the Individual Defendants' management of Corinthian's operations, as
9    well as the Company's job placement rates, availability of programs of study,
10   purported military connections, and quality of internal controls; and (ii) enhance
11   the Individual Defendants' executive and directorial positions at Corinthian and the
12   profits, power, and prestige that the Individual Defendants enjoyed as a result of
13   holding these positions.  In furtherance of this plan, conspiracy, and course of
14   conduct, the Individual Defendants, collectively and individually, took the actions
15   set forth herein.

16        39.    The Individual Defendants engaged in a conspiracy, common
17   enterprise, and/or common course of conduct.  During this time, the Individual
18   Defendants caused the Company to issue misleading financial statements.

19        40.    The purpose and effect of the Individual Defendants' conspiracy,
20   common enterprise, and/or common course of conduct was, among other things, to
21   disguise the Individual Defendants' violations of law, breaches of fiduciary duty,
22   waste of corporate assets, and unjust enrichment; and to conceal adverse
23   information concerning the Company's operations, financial condition, and future
24   business prospects.

25        41.    The Individual Defendants accomplished their conspiracy, common
26   enterprise, and/or common course of conduct by causing the Company to
27   purposefully or recklessly release misleading statements.  Because the actions
28   described herein occurred under the authority of the Board, each of the Individual

1   Defendants was a direct, necessary, and substantial participant in the conspiracy,
2   common enterprise, and/or common course of conduct complained of herein.

3       42.     Each of the Individual Defendants aided and abetted and rendered
4   substantial assistance in the wrongs complained of herein.  In taking such actions
5   to substantially assist the commission of the wrongdoing complained of herein,
6   each Individual Defendant acted with knowledge of the primary wrongdoing,
7   substantially assisted in the accomplishment of that wrongdoing, and was aware of
8   his or her overall contribution to and furtherance of the wrongdoing.

9                       **SUBSTANTIVE ALLEGATIONS**
10  **Regulations Under Title IV**

11      43.     The for-profit education sector is a multi-billion dollar business with
12  most of its revenues guaranteed by loans its students receive from the federal
13  government.  The for-profit education sector—including Corinthian—is currently
14  under severe scrutiny for deceiving investors, the federal government, and its
15  students about its business operations, including, among other things, its fraudulent
16  recruitment tactics and its dismal student loan repayment rates.

17      44.     Most of the current scrutiny concerns for-profit schools' compliance
18  with the HEA.  The HEA was passed "to strengthen the educational resources of
19  our colleges and universities and to provide financial assistance for students in
20  postsecondary and higher education."  It increased federal money given to
21  universities, created scholarships, and gave low-interest loans for students.

22      45.     Title IV of the HEA concerns financial assistance for students.  The
23  purpose of Title IV was "to assist in making available the benefits of postsecondary
24  education to eligible students … in institutions of higher education."  One way
25  Title IV achieves its stated purpose is by providing grants and loans to low-income
26  students in order to allow them to attend institutions of higher education.
27  However, there are strict regulations that for-profit institutions, like Corinthian's

28

1  schools, must comply with in order for their programs to be eligible to receive Title

2  IV funding.

3    46.    The Department of Education specifies extensive criteria which an

4  institution must meet in order to participate in Title IV programs.  The Company's

5  schools and universities must comply with specific standards and procedures set

6  forth in the HEA and the regulations issued thereunder by the Department of

7  Education.  In general, an institution must, among other things, be authorized by

8  each state within which it is physically located to offer its educational programs

9  and maintain institutional accreditation by a recognized accrediting agency.  The

10  institution also must be certified by the Department of Education to participate in

11  Title IV programs based on a determination that the institution meets certain

12  standards of administrative capability and financial responsibility.

13    47.    The Company derives over 80% of its revenues from federal

14  education funds, such as the Pell grant and Stafford loan programs, which assist

15  students in paying for higher education programs. Between 2007 and 2010, the

16  Company tripled the amount of Pell grants it collects, from $170.2 million in 2007

17  to $509.3 million in 2010.  Corinthian has continued to receive nearly half a billion

18  dollars in Pell grants every year since, receiving $487.6 million in fiscal 2011,

19  $411.3 million in fiscal 2012, and $431.4 million in fiscal 2013.  Because the vast

20  majority of Corinthian's revenues are derived from Title IV programs, the

21  Individual Defendants knew that it would be devastating for the Company and its

22  shareholders if the Company were to lose a substantial amount of Title IV funding.

23  **Corinthian's History of Fraud, Deception, and Non-Compliance with**

24  **Applicable Regulations**

25    48.    Prior to the wrongdoing alleged herein, Corinthian faced a number of

26  lawsuits accusing the Company of misleading its students and regulators about job

27  placement rates, starting salaries, the quality of its teaching staff and training

28  equipment, the transferability of its course credits, and the accreditation of certain

of its programs.  These actions include, among others: (i) two *qui tam* actions for violations of the False Claims Act, both filed in 2007; (ii) multiple class actions filed by former students, including actions filed in 2002, 2004, 2005, 2009, two in 2010, and two filed in January and February of 2011; (iii) fifteen securities class actions, with eleven filed and subsequently consolidated in 2004 and four filed and subsequently consolidated in 2010; and (iv) at least two derivative actions, filed in 2004 and 2010, respectively.

49.    Also, in or about 2007, following an extensive investigation, the Attorney General of the State of California brought the 2007 AG Action against two of the Company's wholly-owned subsidiaries concerning Corinthian's repeated misrepresentations of job placement rates.  In July 2007, the Superior Court of the State of California for the County of Los Angeles entered a final judgment for the 2007 AG Action.    Among other things, the court ***permanently enjoined*** the Company from making or causing to be made: (i) any untrue or misleading statement about the employment or salaries that students will or may obtain after enrolling in or completing any of Corinthian's programs; (ii) any statement related to Corinthian's own student's employment or salaries that is not substantiated by the Company's records; or (iii) any statement based on information in Corinthian's records that the Company knew or should know is inaccurate.  Further, Corinthian was required to pay $4.3 million to the Attorney General for distribution to students, and cancel $1.5 million of outstanding credit contract obligations owed to the Company and incurred by students on or after January 1, 2003.

50.    On August 3, 2010 the GAO issued a report concluding that for-profit educational colleges such as Corinthian had engaged in an illegal and fraudulent course of action designed to recruit students and overcharge the federal government for educational costs.  In addition, the GAO investigation revealed serious concerns regarding the academic quality of Corinthian programs, including that the Company had very low academic standards, there was very little

- 21 -

interaction between students and teachers, and that plagiarism and other academic misconduct was not corrected by Corinthian facilities.  Thereafter, a Congressional Committee launched an investigation of such practices.  The Department of Education released data showing that the loan repayment rates for Corinthian enrollees were well below the level required for federal loan program eligibility and the Company disclosed that its enrollee default rates had significantly increased.

51.    On September 28, 2010, Senator Richard J. Durbin spoke directly about Corinthian's deceptive and fraudulent practices.  Senator Durbin noted that Department of Education records indicated that a staggering *76% of Corinthian graduates could not pay the principal on their debt*.  Senator Durbin stated in relevant part:

> How are students doing at [Corinthian's] Everest College? Recently, an undercover Government Accountability Office investigator went and took a look. That investigator posed as a potential student and found that the admissions representative at Everest College misrepresented the cost and length of the program and refused to disclose the graduation rate to this so-called potential student - not surprisingly. Do you know why? Because only 15 percent of the student loans are being paid by the students who go to Everest; 85 percent of them are not paying their loans. It shows they are getting into debt they cannot payoff.
>
> *Data from the Department of Education indicates that Corinthian, overall - in all their different colleges - has a 24 percent repayment rate. Three out of four students who go to their schools cannot pay the principal on their debt after they finish - three out of four. It is the lowest repayment rate of any publicly traded corporation in this business.*

SHAREHOLDER DERIVATIVE COMPLAINT

52.   Over the course of the following two years, and in response to the GAO report and Congressional investigation, various state and federal authorities began investigating the Company concerning its employment, placement, and student loan default rates, among other related issues.   These investigations, which brought a litany of red flags to the Individual Defendants' attention, are summarized below:

(a)   On March 28, 2011, the Company received a letter from the California Attorney General's Office seeking information pursuant to the Stipulated Judgment agreed to by the Company and the California Attorney General in the 2007 AG Action. The letter requested information and documentation related to: (i) the discontinuation of certain programs immediately after the Stipulated Judgment; (ii) numbers of new students, graduating students, and discontinuing students, by program; (iii) marketing and solicitation materials; (iv) enrollment agreements and disclosures; (v) graduating students' employment and compensation; (vi) transferability of credit by the Company's former students; (vii) training provided to employees pursuant to the Stipulated Judgment; and (viii) disciplinary actions against certain categories of employees.

(b)   On April 11, 2011, the Company's Everest Institute in Jonesboro, Georgia, was sent a subpoena from the Atlanta office of Department of Education's Office of Inspector General requesting documents related to the Jonesboro campus's employment and placement rates reported to its accrediting agency, as well as correspondence with the accrediting agency. The matter was brought under the supervision of an Assistant United States Attorney for the Northern District of Georgia who focuses primarily on civil false claims act matters, including *qui tams*.

(c)   On April 29, 2011, the Company's Everest Institute campuses in Brighton and Chelsea, Massachusetts, received civil investigative demands from the Massachusetts Attorney General's Office seeking: (i) information about past

- 23 -

1 students who have enrolled in each institution; (ii) the identity of recruiters; (iii)
2 recruiting and enrollment documents; (iv) documentation related to analyses of
3 delinquency, default, drop out, refund, loan forgiveness or reduction, placement,
4 student income, and/or any student's ability to repay loans; and (v) cohort default
5 and graduation rates.

6          (d)     On May 19, 2011, the Company received a subpoena from the
7 New York Attorney General's Office seeking information on potential issues
8 related to financial aid, admissions, students, securities, and other areas.

9          (e)     On July 19, 2011, the Company's attorneys met with
10 representatives of the Oregon Attorney General's Office in anticipation of a written
11 request for information related to the Company's Everest Institute campus in
12 Tigard, Oregon, and the Everest College and Herald College campuses in Portland,
13 Oregon. On August 11, 2011, the Company received a civil investigative demand
14 from the Oregon Attorney General requesting information and documents
15 regarding: (i) advertising; (ii) student recruitment; (iii) admissions; (iv) licensure
16 and accreditation; (v) compensation, training, and evaluations of admissions
17 personnel; (vi) job opportunities and placements of graduates; (vii) student
18 complaints; and (viii) various other matters.

19     53.    As Corinthian faced increased scrutiny, the Company purportedly
20 instituted various corporate reforms to prevent further wrongdoing. For example,
21 in January 2009, the Board created the Compliance Committee to assist the Board
22 in fulfilling its corporate governance and oversight responsibilities in relation to
23 the Company's regulatory compliance obligations.  Specifically the Compliance
24 Committee is responsible for, among other things, "monitor[ing] the Company's
25 compliance strategies and outcomes, … provid[ing] an open avenue of
26 communication among the Company's employees, senior management, and the
27 Board, … [and] review[ing] the regular internal reports prepared by appropriate
28 Company departments charged with monitoring and overseeing the Company's

SHAREHOLDER DERIVATIVE COMPLAINT

1   compliance efforts."   These purported internal controls enhancements, however,

2   have proved woefully inadequate.

3   **Defendants' Continue Their Manipulative Recruitment and Job Placement**

4   **Reporting Practices Amid Increased Scrutiny and Federal Regulations**

5   54.   On June 2, 2011, President Barack Obama released financial

6   regulations requiring for-profit colleges such as Corinthian to better prepare

7   students for gainful employment or risk losing access to federal student aid.  Under

8   the new regulations, to qualify for federal aid, for-profit colleges are required to

9   prepare students for gainful employment in a recognized occupation.  According to

10   the Department of Education's news release, "a program would be considered to

11   lead to gainful employment if it meets at least one of the following three metrics: at

12   least 35 percent of former students are repaying their loans (defined as reducing the

13   loan balance by at least $1); the estimated annual loan payment of a typical

14   graduate does not exceed 30 percent of his or her discretionary income; or the

15   estimated annual loan payment of a typical graduate does not exceed 12 percent of

16   his or her total earnings."

17   55.   These regulations were designed to ramp up over a three-year period,

18   giving colleges time to reform while protecting students and their families from

19   exploitative programs. "These new regulations will help ensure that students at

20   these schools are getting what they pay for: solid preparation for a good job," U.S.

21   Secretary of Education Arne Duncan said when announcing the new regulation.

22   "We're giving career colleges every opportunity to reform themselves but we're not

23   letting them off the hook, because too many vulnerable students are being hurt."

24   The new regulations, once adopted, were viewed as a significant regulatory victory

25   for the for-profit sector in general, and for Corinthian in particular, because, among

26   other things, companies like Corinthian had extensive time to identify and fix any

27   problems needed to comply with the expected regulations.

28

- 25 -

SHAREHOLDER DERIVATIVE COMPLAINT

56.   Despite the government's increased scrutiny into the for-profit education industry, defendants caused the Company to continue its deceptive recruiting and disclosure practices.   In particular, defendants reported inaccurate employment statistics following graduation: (i) in order to encourage students to apply to the Company's schools; and (ii) for the Company's schools to remain in good standing with college accreditors and continue to be eligible for federal aid dollars.

57.   As explained above, to maintain accreditation, schools must place at least 65% of their graduating students in jobs for which their studies prepared them.   Defendants were able to report high placement rates and meet minimum placement requirements through an improper course of conduct.   A large number of the Company's reported placement figures lacked sufficient supporting documentation.   In some cases, there is no evidence that a single student in a program obtained a job during the timeframe specified in the Company's various disclosures.   Further, as was revealed by the California Attorney General's recent investigation into the Company, the Company's executives had firsthand knowledge of this misconduct, and were acutely aware that Corinthian had a placement compliance problem.   In particular, documents uncovered by the California Attorney General revealed that:

(a)   On or about September 23, 2011, Corinthian's CEO, defendant Massimino, e-mailed a presentation that was to be read by the Executive Leadership Team in advance of an offsite meeting. One of the slides specifically stated: "*We have a placement compliance problem now.*"

(b)   On or about December 7, 2011, the ACCSC sent a letter to the Campus President of Corinthian's Everest College Hayward noting that "39 of the 167 [medical assistant] students reported as employed in field were employed by the same agency, Select Staffing" and that the documentation provided by Everest "did not clearly demonstrate that the employment at Select Staffing constitutes

sustainable employment in a related field." In response, Everest College Hayward admitted that the positions were health screening fair positions but stated that the positions were valid placements.  On or about June 6, 2012, ACCSC sent a follow-up letter to the Campus President, noting that "the majority of placements with Select Staffing resulted in two days of employment and did not clearly demonstrate that the employment at Select Staffing constitutes 'sustainable' employment for a reasonable period of time in a field related to the graduate's educational program."

(c)     On or about February 10, 2012, Corinthian's Western Division President, Nicole Carnagey, e-mailed the Executive Vice President of Operations, defendant Bosic, to tell him that in 2011 Everest College Hayward and Everest College San Francisco paid a temporary agency, Remedy Temp, "to place students to meet the accreditation deadline and minimum placement %." defendant Bosic responded, asking her to find the answers to numerous questions regarding the placements and noted "This is the [expletive omitted] that got [Everest College] Decatur in trouble and the types of questions that need answering."

(d)     On or about March 20, 2012, An Everest College San Francisco internal audit showing that 53% of student placement files reviewed were missing employment verification forms was e-mailed to defendant Massimino, and other senior executives.

(e)     On or about April 13, 2012, an Everest Online internal audit presentation e-mailed to David Poldoian, Executive Vice President of Corinthian's Online Learning Division, ***showed a placement file error rate of 53.6% to 70.6%***.

(f)     On or about April 27, 2012, Corinthian's Executive Vice President of Operations, defendant Bosic e-mailed all division presidents and stated "the placement verification issues we discussed Monday were shared over the last two days and were not well received. We will discuss Monday, but together we'll need to demonstrate improvement. I will be interested in your

thoughts on how we can tighten this up so future audits reflect greater accuracy and completion of documents."

(g)     On or about May 12, 2012, defendant Bosic, e-mailed the Chief Administrative Officer, defendant Ord, and Carmella Cassetta, Senior Vice President and President, Online Learning a copy of a presentation regarding placements which stated "*No current guidelines and training to define a placement* - mistakes are repeated constantly because no clear definition of a placement exists;" and "inconsistent processes on what passes as infield or related [placement]."

(h)     On or about May 18, 2012, Corinthian's Western Division President, Nicole Carnagey and defendant Bosic exchanged e-mails regarding the Renton, Washington, Everest campus's failure of an internal audit due to backdating of signatures on placement files. The e-mails discussed how Everest College Gardena (in California) "almost got hit" as well and saying that "If the current RVPO [Regional Vice President of Operations] was there she would have been in a world of [expletive omitted]." Defendant Bosic also told the Western Division President, Nicole Carnagey that "you are correct that *all the other campuses in yours and other divisions that made it through [verification audits] this time are lucky*."

(i)     On or about June 14, 2012, defendant Bosic, e-mailed defendant Massimino, regarding the findings of an internal review of placement procedures and stated that the review found that there was a "*Lack of workable definitions for a Placement*" and that the lack of specific definitions resulted "in subjective decisions at all levels"; that there "is *no consistent process for Placement* (or other areas of Career Services) and lack of SOP's [Standard Operating Procedures]"; that there "is generally *no training at the process level for Placement* (since there is no standard process)"; and that "Campus Vue [Corinthian's data management system] is not fully utilized [which] [l]eads to poor

- 28 -

1   data or lack of data availability as well as **duplication of data across forms and the**
2   **Placement Verification system.**"

3       (j)     On or about July 13, 2012, Corinthian's Vice President of
4   Compliance, Michelle Reed e-mailed defendant Wilson regarding results of a
5   review of Corinthian's WyoTech Long Beach, California, self-employment
6   placements. The review showed that the **files for twenty-eight of seventy-four**
7   **such placements had missing documents**, or included Craigslist ads that purported
8   to be from the students in question, but that had in fact been created by Corinthian.
9   **An additional fifteen files were suspicious. Despite these known irregularities, as**
10  **of August 12, 2013, the Long Beach disclosures (published on July 1, 2012) had**
11  **not been amended to take into account the audit's findings**.

12      (k)     On or about July 16, 2012, Corinthian's Assistant Vice
13  President of Student Outcomes e-mailed Division Presidents regarding Career
14  Services Operating Procedures, with a copy to the Executive Vice President of
15  Operations. The e-mail stated that, "**[o]ver the past year, several campuses have**
16  **had challenges providing adequate documentation for placements and waivers**.
17  Issues that have surfaced during audits and Employment Verification reviews are
18  missing key fields such as signatures, inconsistencies with CampusVue / other
19  backup and in some cases, documentation that was never procured or cannot be
20  found."

21      (l)     On or about August 28, 2012, the results of a third-party audit
22  conducted by Hyper Core solutions on behalf of an accreditor, ACCSC, were e-
23  mailed to Corinthian's Executive Vice President and Chief Academic Officer. The
24  review, which examined a random sample of 330 student records showed
25  **substantial issues at each Corinthian campus examined** (Everest campuses
26  including West Los Angeles, City of Industry, and Reseda, California). In
27  particular, the review found that **30% of the placements could not be verified and**
28  **that there were no records to substantiate a further 9% of the placements**. At

Everest College West Los Angeles, only 30% of criminal justice program placements could be verified and 20% were identified as no record found. At the same campus, only 36% of dental assistant program placements could be verified and 55% were identified as no record found.

58.     The above, highly material information was disseminated to the Board through, among other avenues, the Company's Compliance Committee which regularly meets with the Board and is charged with "provid[ing] an open avenue of communication among the Company's employees, senior management and the Board" concerning regulatory and legal compliance.

59.     The California Attorney General's investigation further revealed that Corinthian's own data and files suggest that the Company's job placement rates have been subject to manipulations and assumptions not disclosed to the public, including, but not limited to: (i) the exclusion of data from certain Corinthian schools from placement calculations in order to bring the placement rate higher; (ii) improper inclusion of a substantial number of placements that occurred outside the timeframe specified by the disclosures; (iii) a substantial number of double-counted placements; (iv) a substantial number of unverified placements and waivers; (v) instances of Corinthian paying temporary agencies to employ graduates in order to inflate placement rates; (vi) backdated placement files; (vii) fabricated placement files; and (viii) Company-wide placement verification issues, including a lack of any definitions or standard procedures.  As such, these jobs should not have been included in the Company's reported placement figures.

60.     As Corinthian graduates continued to struggle to find gainful employment, their default rates predictably continued to climb.  On July 30, 2012, following a two-year investigation of the for-profit college industry, Senator Tom Harkin, chairman of the Health, Education, Labor and Pensions Committee issued a report "For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success" (the "Harkin Report").   The Harkin

Report highlighted the fact that Corinthian's low quality programs combined with its aggressive lending and recruiting practices resulted in a student body that is underprepared for college, unable to obtain gainful employment, and straddled with debt.  The Harkin Report further noted that the Company's students have one of the highest default rates in the country and that Corinthian is at risk of losing its eligibility for federal financial aid as a result.  To make matters worse, the Harkin Report found that instead of attempting to address known problems with the students' inability to obtain gainful employment, the Company actively sought to hide the growing default rates by encouraging students to enter deferment and forbearance programs.  These temporary relief programs allowed the Company to mask the issue and account for the loans as performing, rather than in default.  The Harkin Report stated in relevant part:

> Corinthian's default rate has… increased, growing from 22.9 percent for students entering repayment in 2005 to 36.1 percent for students entering repayment in 2008. ***This is by far the highest default rate of any publicly traded company examined, and the second highest overall. The default rate is 64 percent higher than the rate for all for-profit colleges.*** While the company's high default rate is likely due in part to the high cost of Corinthian'[s] programs, it also raises serious questions regarding the quality of the programs Corinthian provides, and whether its students who complete programs earn high enough wages to repay the debt they take on. Had the 3-year cohort default rate provision been in effect in 2011, Corinthian would have faced the loss of access to title IV financial aid dollars.
>
> * * *
>
> Corinthian has focused significant resources on finding ways to eliminate students from its reported default rates. Helping get delinquent students into repayment, deferment, or forbearance prior to

default is encouraged by the Department of Education. However, many for-profit colleges appear to be investing in aggressive tactics for the sole purpose of ensuring that borrowers do not default within the 3-year regulatory window.

Default management is primarily accomplished by putting students who have not made payments on their student loans into temporary deferments or forbearances. While the use of deferment and forbearance is fairly widespread throughout the sector, documents produced indicate that a number of companies also pursue default management strategies that include loan counseling, education, and alternative repayment options. ***Default management contractors are paid to counsel students into repayment options that ensure that students default outside the 2-year, soon to be 3-year, statutory window in which the Department of Education monitors defaults.***

Forbearances may not always be in the best interest of the student. This is because during forbearance of Federal loans, as well as during deferment of unsubsidized loans, interest still accrues. The additional interest accrued during the period of forbearance is added to the principal loan balance at the end of the forbearance, with the result that interest then accrues on an even larger balance. Thus, some students will end up paying much more over the life of their loan after a forbearance or deferment.

## MISLEADING STATEMENTS

61.   As noted above, the Company has been permanently enjoined from making any statement related to Corinthian's own student's employment or salaries that is not substantiated by the Company's records, or any statement based on information in Corinthian's records that the Company knew or should know is inaccurate.  Further, because of Corinthian's poor compliance history and the more

- 32 -

1  recent scrutiny of the Company in the wake of numerous investigations, the GAO
2  report, and numerous lawsuits on behalf of students misled by the Company's
3  recruitment practices in the past, defendants were required to be particularly
4  vigilant in monitoring and overseeing the Company's schools' operations, and in
5  particular, their regulatory compliance.    Defendants also should have been
6  particularly careful about warning investors of the Company's regulatory risks, and
7  providing investors with accurate information with which to assess these
8  regulatory risks.  Instead, however, the defendants repeatedly misled investors with
9  extremely optimistic statements regarding the Company's "focus[] on compliance,"
10 which included misleading representations regarding the robust job placement
11 figures that the Company purportedly achieved.

12         62.    More, the Compliance Committee ensured that the members of the
13 Board and other top executives were awash in "red flags" that necessarily informed
14 them that Corinthian's placement compliance and recordkeeping was woefully
15 inaccurate and highly manipulated.    Nonetheless, the Individual Defendants
16 repeatedly caused or allowed the Company and themselves to improperly boast
17 about Corinthian's robust job placement metrics, which they knew or should have
18 known were unsupported by the Company's own records.    The Individual
19 Defendants also repeatedly caused or allowed the Company and themselves to
20 issue misleading statements about Corinthian's purported compliance with various
21 regulations.

22         63.    The first misleading statement was issued on August 23, 2011, when
23 the Company issued a press release announcing fiscal 2011 fourth quarter and
24 annual results, and reported fourth quarter net revenue of $425.2 million, total
25 student population of 93,457, total new students of 24,981, operating income of
26 $6.7 million and net income of $3.4 million or $0.05 per share. The Company also
27 reported annual revenues of $1.87 billion and a net loss of $111 million or $1.28
28 per share. In the press release, defendant Massimoto touted the Company's

- 33 -

SHAREHOLDER DERIVATIVE COMPLAINT

purported assistance in finding jobs for a "record number" of students in their fields of study.   Defendant Massimoto also boasted about steps the Company purportedly took to remain in compliance with the 90/10 Rule[2].   The press release stated in relevant part:

> "We navigated through a number of challenges in fiscal 2011 and made progress in several areas," said Jack Massimino, Corinthian chairman and chief executive officer. "We continued to focus on student completion, and *we assisted a record number of graduates in finding jobs in their fields of study. In the area of regulatory compliance, we developed and implemented a new compensation program for front-line admissions and student finance representatives and expanded our disclosures related to completion, placement and program costs. We took steps to remain in compliance with the 90/10 Rule, including a new external student financing program.* We also continued to increase the efficiency of our back-end operations, particularly in the area of cohort default management and financial aid processing. As a result, we no longer consider two-year CDRs to be a significant risk for our company.

---

[2] Corinthian's for-profit educational institutions must comply with the 90/10 Rule. An educational institution will be ineligible to participate in Title IV programs if, for any two consecutive fiscal years, it derives more than 90% of its cash basis revenue from Title IV programs. An institution that derives more than 90% of its revenue from Title IV programs for any single fiscal year will be placed on provisional certification for two fiscal years and will be subject to potential sanctions by the Department of Education. Corinthian's educational institutions are required to calculate this percentage at the end of each fiscal year, and if they are not in compliance, they must return any Title IV funds that were received while they were ineligible.

SHAREHOLDER DERIVATIVE COMPLAINT

64. On August 24, 2011 the Company filed its Annual Report for the period ended June 30, 2011 on a Form 10-K with the SEC signed by, defendants Massimino, Ord, St. Pierre, Skladany, Adler, Lee, Sullivan, Dionisio, Kane, Hartshorn, and Robinson. The Form 10-K reiterated the Company's previously reported financial results and financial position. The Form 10-K further noted that "[g]raduate placement outcomes are critical to the success of [Corinthian] schools and their ability to continue to enroll new students," and touted the Company's "solid results" in "help[ing its] graduates find employment." The Form 10-K was filed less than a month before defendant Massimino admitted that Corinthian has "*a placement compliance problem now*." In addition, despite the Company's inadequate internal controls and lack of reliable job tracking metrics, the Form 10-K proclaimed that "approximately 67.6% of [Corinthian] graduates in calendar year 2010 who were available for placement have been placed in a job for which they were trained by June 30, 2011, using accrediting agency standards." The Form 10-K also stated the following regarding the Company's purported compliance efforts:

> As of June 30, 2011, we employed approximately 2,400 admissions representatives who work directly with prospective students to facilitate the admissions process. These representatives interview and advise students interested in specific careers and are a key component of our effort to generate interest in our educational services. We conduct semi-annual student satisfaction surveys at our campuses in the United States in which students have consistently given high marks to our admissions personnel for helpfulness, courtesy and accuracy of information. Because our success is highly dependent on the efficiency and effectiveness of our admissions process, we invest considerable resources to train our admissions representatives in product knowledge, regulatory compliance, and customer service. We

- 35 -

also employ various admissions supervisory and monitoring programs, and conduct student surveys which help us ensure compliance with both government regulations and our corporate policies.

* * *

As required by their respective regional accrediting agencies, Everest College Phoenix and Heald College are overseen by boards of trustees that include a majority of independent members who review academic integrity and autonomy of the institutions. These governing boards have broad oversight over the schools' programs and operations, set the strategic direction for the institutions, play an active role in policy-making, and review financial resources of their schools to ensure the institution is able to provide a sound educational program. In furtherance of that mission, each board of trustees develops policies appropriate to the needs of the school and works closely with the respective schools' administrations to, among other things, establish a climate for articulating and promoting the educational vision of the schools.

* * *

In addition to the program integrity issues specifically addressed above, the final regulations issued by [Department of Education] on October 29, 2010 include provisions regarding the types of statements by an institution or parties related to an institution that constitute prohibited misrepresentation; written agreements between institutions, particularly institutions under common ownership or control; the administration of ability-to-benefit examinations; requirements regarding an institution's return of Title IV program funds; and certain other issues pertaining to a student's eligibility to receive Title IV

- 36 -

program funds. We have modified many of our practices as a result of the final regulations issued on October 29, 2010.

\* \* \*

In order to improve our overall default rates, we have implemented a multi-faceted cohort default prevention program. This program includes the following: a contact management system to assist in reaching students who are no longer in school; an internal department focused primarily on early stage delinquencies; an expanded program of entrance and exit counseling and financial literacy training for current students; and the use of outside firms and internal resources to reach borrowers and assist them in contacting their lenders and getting help with alternatives to default, including income-based repayment, deferral and forbearance.

\* \* \*

Under certain circumstances, an institution may elect to admit non-high school graduates into certain of its programs of study. In such instances, the institution must demonstrate that the student has the "ability to benefit" from the program of study. The basic evaluation method to determine that a student has the ability to benefit from the program is the student's achievement of a minimum score on a test approved by the [Department of Education] and independently administered in accordance with [Department of Education] regulations. In addition to the testing requirements, the [Department of Education] regulations prohibit enrollment of [ability to benefit] students from constituting 50% or more of the total enrollment of the institution to qualify for Title IV funding. None of our colleges·that accept [ability to benefit] students has an [ability to benefit] enrollment population that exceeds 50% of the total enrolled

- 37 -

1    population. As of June 30, 2011, [ability to benefit] students

2    represented approximately 4.3% of our total student population, down

3    from 15.1 % at June 30, 2010.

4    65.    On May 3, 2012, the Company issued a press release announcing

5    fiscal 2012 third quarter results, and reported net revenue of $424.1 million, a total

6    student population of 96,631, total new students of 29,427, operating income of

7    $26.1 million, and net income of $0.11 per share.  In the press release, defendant

8    Massimino boasted about the Company's new student enrollment growth but failed

9    to disclose that the growth was in part the result of Corinthian's misleading job

10   placement metrics that were attracting potential students, and that the growth was

11   likely to wane as the truth about the Company's practices was revealed.  Defendant

12   Massimino stated in relevant part:

13       "As anticipated, our new student enrollment growth improved in the

14       third quarter this year compared to the same quarter last year,"

15       Massimino said. "The improvement is the result of several factors,

16       including gradual stabilization in ground school new enrollments,

17       continued strong growth at Everest University Online, and a less

18       challenging comparison to the third quarter last year. We expect the

19       rate of new enrollment growth to remain positive in the fourth

20       quarter."

21   66.    On August 20, 2012, the Company issued a press release announcing

22   fiscal 2012 fourth quarter and annual results, and reported fourth quarter net

23   revenue of $394.8 million, total student population of 91,460, total new students of

24   25,839, operating income of $16.4 million and a net loss of $6.5 million. The

25   Company also reported annual revenues of $1.6 billion and a net loss of $10.2

26   million or $0.12 per share.  The press release stated in relevant part:

27       "Fiscal 2012 was a year of progress against a backdrop of adapting to

28       regulatory change," said Jack Massimino, Corinthian chairman and

- 38 -

SHAREHOLDER DERIVATIVE COMPLAINT

chief executive officer. "*We continued to focus on student completion and achieved a slight increase in our graduate placement rate despite a weak economy.* We reduced operating expenses to align with our lower student population and took steps to close or sell nine underperforming campuses. We strengthened our financial position by renewing our line of credit on favorable terms, completing a sale-leaseback of five Heald facilities, and extending by two years our student lending agreement with ASFG. We continued to increase the efficiency of our back-end operations by completing the implementation of our common student information system at Heald. We brought student financial aid processing in-house and substantially reduced bad debt as a percent of revenue. We also made progress in cohort default prevention and as a result, no longer consider two-year or three-year cohort default rates to pose an immediate risk to our company. *On the regulatory front, we continued to implement policies and procedures in response to new federal regulations and remained focused on compliance.*"

67.    Also on August 20, 2012, the Company held an earnings conference call with investors to discuss the quarterly and annual results for the recently ended period.  During the call, defendant Massimino again stated that more than two-thirds of Corinthian graduates found employment in their fields of study. Defendant Massimino made these statements just five months after receiving an internal audit demonstrating that at least one of Corinthian's colleges was missing employment verification forms for 53% of student placement files.   These statements were made just over two months after defendant Massimino (and through the Compliance Committee, the Individual Defendants) learned that an internal review of placement procedures found: (i) a "[l]ack of workable definitions for a Placement;" (ii) "no consistent process for Placement ... and lack of SOPs

SHAREHOLDER DERIVATIVE COMPLAINT

1  [Standard Operating Procedures];" (iii) "generally no training at the process level
2  for Placement;" and (iv) "duplication of data across forms and the Placement
3  Verification system."   Defendant Massimino further touted the Company's
4  purported transition to new federal regulations and focus on compliance.
5  Defendant Massimino stated in relevant part:

> We made considerable operational progress in fiscal 2012 while
> continuing our transition to new federal regulations…. In light of this
> challenging economic environment, **_we're very pleased to report that_**
> **_more than two-thirds of our nearly 49,000 graduates in calendar_**
> **_year 2011 found jobs in the fields for which they were trained_**.
>
> * * *
>
> We implemented policies and procedures in response to new
> regulatory requirements in a number of areas, primarily marketing,
> admissions, and student finance. We continued to focus on improving
> the student value proposition while complying with the 90/10 Rule.
>
> * * *
>
> **_For students who graduated in calendar 2011, 68.1% or more than_**
> **_33,000 graduates found employment in their fields of study. This is_**
> **_up slightly from 67.6% in the previous year, and the current run rate_**
> **_for calendar 2012 grads is higher than in 2011._**
>
> * * *
>
> **_We're making the transition to new federal regulations and remain_**
> **_focused on compliance._** We have a number of initiatives in place to
> help address the loss of ability-to-benefit students and generate
> positive new enrollment growth beginning in the back half of fiscal
> 2013.

27       68.    On or about August 20, 2012 and October 31, 2012, Corinthian
28  provided quarterly presentations to investors that improperly touted that "CY

[Calendar Year] 11 placement 68.1% vs. 67.6% in CY 10." The presentations did not reveal the Company's continuing struggle to accurately measure job placement metrics.

69.    On August 24, 2012 the Company filed its Annual Report for the period ended June 30, 2012 on a Form 10-K with the SEC signed by defendants Massimino, St. Pierre, Skladany, Adler, Lee, Sullivan, Dionisio, Kane, Hartshorn, and Robinson.   The Form 10-K reiterated the Company's previously reported financial results and financial position, and stated that almost 70% of Corinthian's 2011 graduates were placed in a job for which they were trained by June 30, 2012. The Form 10-K further stated that job placement rates were purportedly determined "using accrediting agency standards," but failed to disclose the Company's woefully inadequate record keeping policies.

70.    On or about January 31, 2013, the Company held an earnings conference call with investors.   During the call, defendant Massimino stated that the Company expected to increase its already "solid results" and placement rate for 2012.   Defendant Massimino again failed to disclose that Corinthian's numbers were likely inflated as a result of the Company's abysmal job placement tracking methods.   Defendant Massimino stated in relevant part:

> In the area of placement, we continue to achieve solid results for the 2012 cohort graduates. We currently expect our calendar 2012 placement rate to meet or slightly exceed our placement rate in calendar 2011, which was 68.1%.

71.    On March 11, 2013, Corinthian held a conference call with investors. During the call, defendant Massimino touted the Company's "remarkable job" of placing students in gainful employment.   Defendant Massimino further boasted that the Company was "very tight on [the Company's] definitions" relating to placing students in the areas Corinthian trained them for.   Defendant Massimino

SHAREHOLDER DERIVATIVE COMPLAINT

also again stated that the Company's placement rates were nearly 70%.  In relevant part, defendant Massimino stated:

> This is just a quick slide on information we've given you over the years around graduation and placement. And one of the things we are pretty proud of is in a pretty difficult time, we have done a pretty remarkable job in terms of placement. We have over 800 placement people in our organization today helping our students get jobs in the areas we trained them for. We are very tight on our definitions. And so if you're a medical assistant, for example, with us, and you get a job at a doctor's office, a hospital, those count. If you get a job as an aid in a nursing home, that does not count even though you're making $10 to $12 an hour. *So we're very tight on our definitions around what is and what isn't included in our placements.*
>
> *We've been averaging, over the course of this very difficult time, up to around 68%, 69%. And we're about there again this year.*

72.     On April 30, 2013, the Company issued a press release announcing fiscal 2013 third quarter results, and reported net revenue of $400.2 million, total student population of 87,776, total new students of 26,738, and operating income of $12.6 million.

73.     Also on April 30, 2013, the Company held an earnings conference call with investors to discuss the results from the recently ended period.  During the call, defendant Massimino stated that the Company had a "robust, in-house cohort default defensive program" including "counseling related to repayment options and early intervention in the default process."  Defendant Massimino failed to disclose that the Company was in fact merely pushing students into deferment or forbearance in attempt to ensure that students default outside of the statutory window in which the Department of Education monitors defaults.  Defendant Massimino stated in relevant part:

SHAREHOLDER DERIVATIVE COMPLAINT

As we reported in an 8-K on March 25, the weighted average for our institutions was 19%, well below the federal threshold of 30% and 9.2 percentage points below the 28.2% reported for the preliminary three-year measurement of the 2009 cohort. *We've achieved this improvement in part by establishing a robust, in-house cohort default defensive program. Our program includes financial literacy training provided to students while they are in school, counseling related to repayment options and early intervention in the default process.*

74.    On April 30, 2013, the Company also filed its quarterly report for the period ended March 31, 2013 on a Form 10-Q with the SEC reiterating the Company's previously reported financial results and financial position.

75.    Commensurate with the above noted January 31, 2013, March 11, 2013, and April 30, 2013, earnings conference calls, Corinthian provided presentations to investors improperly touting the Company's purported "[f]ocus on employment" and stating that that 33,316 of 48,930 eligible graduates in the 2011 graduation cohort were "[p]laced in [f]ield."

**THE INDIVIDUAL DEFENDANTS CONTINUE TO MAKE FALSE STATEMENTS WHILE THE TRUTH SLOWLY EMERGES**

76.    On June 10, 2013, the Company filed a Current Report on Form 8-K with the SEC disclosing that it received a subpoena from the SEC.  The press release further disclosed that the SEC is conducting an investigation of the Company related to student recruitment, attendance, completion, placement, defaults on loans, as well as the Company's compliance with Department of Education financial requirements, standards and ratios (including the effect of certain borrowings under the Company's credit facility on the Company's

SHAREHOLDER DERIVATIVE COMPLAINT

composite score, and 90/10 Rule compliance), and other corporate, operational, financial, and accounting matters.

77.    The following day, Corinthian's market capitalization fell nearly 11.47%, erasing $28.4 million in market capitalization overnight.

78.    On September 3, 2013, the Company filed its Annual Report on a Form 10-K with the SEC.  Despite the countless investigations and actions against Corinthian to the contrary, the Company continues to maintain that "the efforts [it] devote[s] to help [Corinthian] graduates find employment have achieved solid results in a difficult economic environment."   The Company also continues to boast a job placement rate of "approximately 69%."  The Form 10-K was signed by defendants Massimino, St. Pierre, Skladany, Adler, Lee, Sullivan, Dionisio, Kane, Hartshorn, Robinson, and Morial.

## REASONS THE STATEMENTS WERE MISLEADING

79.    Throughout the relevant period, the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that the Company was permanently enjoined from making any statement related to Corinthian's own student's employment or salaries that is not substantiated by the Company's records, or any statement based on information in Corinthian's records that the Company knew or should know is inaccurate.

80.    The Individual Defendants also knew, consciously disregarded, or were reckless in not knowing that the Company's job placement tracking and reporting was woefully inadequate and subject to significant manipulation.

81.    Further, the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that, contrary to their public statements, the Company's practices included reporting inaccurate and/or misleading job placement statistics.

82.    Similarly, the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that, contrary to their public statements, the

SHAREHOLDER DERIVATIVE COMPLAINT

1 Company's practices included reporting misleading statements concerning its
2 regulation compliance and efforts to lower default rates.

3    83.    Finally, the Individual Defendants knew, consciously disregarded, or
4 were reckless in not knowing that the Company failed to maintain proper internal
5 controls to prevent job placement statistics and regulation compliance matters from
6 being misleadingly reported.

7                    **DAMAGES TO CORINTHIAN**

8    84.    As a result of the Individual Defendants' improprieties, Corinthian
9 disseminated misleading public statements concerning the Company's job
10 placement rates, compliance with various regulations, and quality of internal
11 controls.

12    85.    Corinthian's misleading statements also damaged its reputation within
13 the business community and in the capital markets.  The Company's job placement
14 metrics are highly material to the Company's potential students who are seeking to
15 gain skills and find a position that will help them launch a successful career.
16 Potential students are far less likely to enroll in Corinthian programs with
17 knowledge that the Company overstates its job placement metrics.  More, investors
18 are far less likely to invest in a company that cannot accurately measure "the most
19 important metric in the Company."  Corinthian's ability to raise equity capital or
20 debt on favorable terms in the future is now impaired.  In addition, the Company
21 stands to incur higher marginal costs of capital and debt because the improper
22 statements and misleading projections disseminated by the Individual Defendants
23 have materially increased the perceived risks of investing in and lending money to
24 the Company.

25    86.    Further, as a direct and proximate result of the Individual Defendants'
26 actions, Corinthian has expended, and will continue to expend, significant sums of
27 money.  Such expenditures include, but are not limited to:

28

1          (a)    costs incurred in investigating, defending, and settling and/or
2    paying a judgment in the pending securities fraud class action and 2007 AG
3    Action;

4          (b)    potentially hundreds of millions of dollars in settlement or to
5    satisfy an adverse judgment;

6          (c)    legal fees, settlements, and/or judgments in the litany of
7    lawsuits filed against the Company by students misled by the Company's improper
8    recruiting practices and inaccurate job placement statistics;

9          (d)    costs incurred in responding to the SEC subpoena;

10         (e)    costs incurred in potentially refunding tuition to students if the
11   school they attended loses its accreditation;

12         (f)    costs incurred from responding to the investigations of states'
13   Attorney's General;

14         (g)    amounts paid to outside lawyers, accountants, and investigators
15   in connection with any internal investigations into its improper business practices;

16         (h)    costs incurred from the increased level of government scrutiny
17   and oversight the Company must endure in order to maintain their schools'
18   accreditation; and

19         (i)    costs incurred from compensation and benefits paid to the
20   defendants who have breached their duties to Corinthian.

21                **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

22         87.    Plaintiff brings this action derivatively in the right and for the benefit
23   of Corinthian to redress injuries suffered, and to be suffered, by Corinthian as a
24   direct result of breaches of fiduciary duty, waste of corporate assets, and unjust
25   enrichment, as well as the aiding and abetting thereof, by the Individual
26   Defendants.  Corinthian is named as a nominal defendant solely in a derivative
27   capacity.  This is not a collusive action to confer jurisdiction on this Court that it
28   would not otherwise have.

SHAREHOLDER DERIVATIVE COMPLAINT

88.    Plaintiff will adequately and fairly represent the interests of Corinthian in enforcing and prosecuting its rights.

89.    Plaintiff was a shareholder of Corinthian at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Corinthian shareholder.

90.    The current Board of Corinthian consists of the following eleven individuals: defendants Massimino, St. Pierre, Hartshorn, Adler, Lee, Kane, Dionisio, Skladany, Sullivan, Robinson, and Morial.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Massimino, St. Pierre, Hartshorn, Adler, Lee, Kane, Dionisio, Skladany, Sullivan, Robinson, and Morial Face a Substantial Likelihood of Liability for Their Misconduct**

91.    Corinthian specializes in providing for-profit education and relies substantially on the federal government to loan money to its students to pay for their education.  Corinthian's job placement and student loan repayment rates were a forceful indicator of the Company's business condition and the metrics that the Company used to measure its current and future financial performance.  Indeed, when the information at issue pertains to a company's core business or service, as it does here, knowledge of that information may be imputed to the entire Board through inference as a matter of law.  Further, the Board had a heightened duty to pay close attention to Corinthian's job placement metrics and the accuracy thereof as a result of countless lawsuits regarding the Company's misleading job placement disclosures, federal and state investigations into the Company's misleading job placement disclosures, and a permanent injunction that barred the Company from making any statement related to Corinthian's own student's employment or salaries that is not substantiated by the Company's records, or any statement based on information in Corinthian's records that the Company knew or should know is

- 47 -

SHAREHOLDER DERIVATIVE COMPLAINT

1  inaccurate.   Thus, each of the members of Corinthian's Board are charged with
2  having knowledge of the issues described herein related to the Company's false and
3  misleading statements about its purportedly successful job placement rates.

4       92.   More, the Company's Compliance Committee is charged with
5  "providing an open avenue of communication among the Company's employees,
6  senior management and the Board" concerning regulatory and legal compliance.
7  As a result, the members of the Board were awash in red flags, including: (i)
8  numerous federal and state investigations; (ii) numerous lawsuits against the
9  Company alleging that Corinthian misled its students and regulators about job
10  placement rates, the quality of its teaching staff and training equipment, the
11  transferability of its course credits, and the accreditation of certain of its programs;
12  and, (iii) a litany of internal communications between top executives at the
13  Company, including its Chairman of the Board, defendant Massimino regarding
14  woefully inadequate job placement tracking and rampant file manipulations.  These
15  red flags necessarily informed each of the Board members of the rampant
16  violations taking place within the Company, including with respect to: (i)
17  Corinthian's "placement compliance problem," (ii) a lack of definitions, training,
18  and standard operating procedures in placement evaluations; and (iii) internal and
19  external audits revealing numerous files with missing or inadequate documents
20  supporting job placement and massive placement error rates.

21       93.   Given the duties placed on the Company's Board as described above,
22  to the extent any of the Individual Defendants did not have actual knowledge of the
23  extensive violations of the permanent injunction, such lack of knowledge could
24  only be the product of willful blindness that constitutes a bad faith breach of their
25  fiduciary duties.

26       94.   As alleged above, defendants Massimino, St. Pierre, Hartshorn, Adler,
27  Lee, Kane, Dionisio, Skladany, Sullivan, Robinson, and Morial, comprising the
28  entire Board, breached their fiduciary duty of loyalty by making misleading

1  statements in the Company's Forms 10-K regarding Corinthian's job placement

2  rates and purported regulatory compliance efforts.  Thus, demand is futile as to the

3  Director Defendants.

4       95.   The Director Defendants, as members of Corinthian's Board, each

5  knew, failed to act in the face of a known duty to act, and/or were grossly negligent

6  when they allowed the Company to issue public statements, press releases, and

7  filings with the SEC regarding the Company's job placement and loan repayment

8  rates.  Moreover, the Director Defendants each knew and/or failed to act in the face

9  of a known duty to act by allowing this materially false and misleading information

10  to be disseminated to the investing public.  The Director Defendants knowingly

11  and with conscious disregard participated in the dissemination of this deceptive

12  information.  Thus, demand is futile as to the Director Defendants.

13       96.   Defendants Adler, Dionisio, Hartshorn, and Lee, as members of the

14  Audit Committee, reviewed and approved the misleading statements and earnings

15  guidance.  The Audit Committee's Charter provides that it is responsible for

16  compliance with accounting, legal, and regulatory requirements.  Thus, the Audit

17  Committee Defendants were responsible for knowingly or recklessly allowing the

18  misleading statements related to the Company's earnings guidance and financial

19  and disclosure controls.  Moreover, the Audit Committee Defendants reviewed and

20  approved the misleading press releases made to the public.  Despite their

21  knowledge or reckless disregard, the Audit Committee Defendants caused these

22  misleading statements.  Accordingly, the Audit Committee Defendants breached

23  their fiduciary duty of loyalty and good faith because they participated in the

24  wrongdoing described herein.  Thus, the Audit Committee Defendants face a

25  substantial likelihood of liability for their breach of fiduciary duties so any demand

26  upon them is futile.

27       97.   Defendants Adler, Kane, Lee, and St. Pierre, as members of the

28  Compliance Committee, were required to: (i) monitor and oversee the Company's

- 49 -

SHAREHOLDER DERIVATIVE COMPLAINT

1  regulatory compliance efforts; (ii) ensure that an appropriate framework of
2  policies, procedures, internal controls, reporting, ethical standards and employee
3  accountability is established to achieve regulatory and legal compliance; and (iii)
4  embed compliance awareness and accountability throughout the Company.
5  Despite these duties, the Compliance Committee Defendants caused or allowed the
6  Company to conceal its non-compliance with minimum job placement
7  requirements, fail to comply with various federal and state regulations, including
8  Title IV and gainful employment regulations, and engage in illicit and
9  manipulative recruiting tactics.

10      98.    Moreover, despite the Individual Defendants having knowledge of the
11  claims and causes of action raised by plaintiff, the current Board has failed and
12  refused to seek to recover for Corinthian for any of the wrongdoing alleged by
13  plaintiff herein.

14      99.    Plaintiff has not made any demand on the other shareholders of
15  Corinthian to institute this action since such demand would be a futile and useless
16  act for at least the following reasons:

17          (a)   Corinthian is a publicly held company with over 86.4 million
18  shares of common stock outstanding and thousands of shareholders;

19          (b)   making demand on such a large number of shareholders would
20  be impossible for plaintiff who has no way of finding out the names, addresses, or
21  phone numbers of shareholders; and

22          (c)   making demand on all shareholders would force plaintiff to
23  incur excessive expenses, assuming all shareholders could be individually
24  identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

27      100.   Plaintiff incorporates by reference and realleges each and every
28  allegation contained above, as though fully set forth herein.

- 50 -

101.   The Individual Defendants owed and owe Corinthian fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Corinthian the highest obligation of good faith, fair dealing, loyalty, and due care.

102.   The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Corinthian, and/or consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

103.   The Officer Defendants breached their duty of loyalty by knowingly, recklessly, or with gross negligence causing and/or allowing the Company to make misleading statements in the Company's Forms 10-K concerning the Company's job placement rates and compliance with regulatory law.  Defendant Massimino breached his duty of loyalty by knowingly, recklessly, or with gross negligence making misleading statements in the Company's conference calls, press releases, and public filings concerning the Company's job placement rates and compliance with regulatory law.  The Officer Defendants breached their duty of loyalty by knowingly, recklessly, or with gross negligence by failing to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures.

104.   The Director Defendants breached their duty of loyalty by knowingly or recklessly making misleading statements in the Company's Forms 10-K concerning the Company's job placement rates and compliance with regulatory law.  Furthermore, the Director Defendants breached their fiduciary duty of loyalty by failing to ensure that an adequate system of internal controls was in place.  The Director Defendants breached their duty by either knowingly or recklessly ignoring the Company's compliance with regulatory law, and allowing these issues to continue unabated.

105.   The Audit Committee Defendants, Adler, Dionisio, Hartshorn, and Lee, breached their fiduciary duty of loyalty by knowingly or recklessly overseeing and allowing the Company's improper practices and implementation of a business model that put the Company at risk of losing accreditation and federal funding for its schools.  This constituted a violation of the duties of the members of the Audit Committee under its Charter.  In addition, defendants Adler, Dionisio, Hartshorn, and Lee, as members of the Audit Committee, reviewed and approved the misleading statements regarding the Company's job placement statistics.

106.   The Compliance Committee Defendants, Adler, Kane, Lee, and St. Pierre breached their fiduciary duty of loyalty by causing or allowing the Company to conceal its non-compliance with minimum job placement requirements, fail to comply with various federal and state regulations, including Title IV and gainful employment regulations, and engage in illicit and manipulative recruiting tactics.

107.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Corinthian has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

108.   Plaintiff, on behalf of Corinthian, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

109.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110.   As a result of the misconduct described above, the Individual Defendants have caused Corinthian to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

111.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

SHAREHOLDER DERIVATIVE COMPLAINT

112.   Plaintiff, on behalf of Corinthian, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

113.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

114.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Corinthian.   The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Corinthian.

115.   Plaintiff, as a shareholder and representative of Corinthian, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

116.   Plaintiff, on behalf of Corinthian, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Corinthian, demands judgment as follows:

A.   Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.   Directing Corinthian to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Corinthian and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

- 53 -

1           1.    a provision to permit the shareholders of Corinthian to nominate and appoint at least three directors to the Board;

2.    a proposal to ensure that the newly appointed directors define and implement the establishment, maintenance, and oversight of the Company's Title IV compliance;

3.    a proposal to ensure that the newly appointed directors define and implement measures to strengthen the Company's disclosure controls and procedures; and

4.    a proposal to ensure that the newly appointed directors define and implement measures to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Corinthian has an effective remedy;

D.    Awarding to Corinthian restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

SHAREHOLDER DERIVATIVE COMPLAINT

1

**JURY DEMAND**

2

  Plaintiff demands a trial by jury.

3

Dated: November 14, 2013     ROBBINS ARROYO LLP

4

                BRIAN J. ROBBINS
                CRAIG W. SMITH

5

                SHANE P. SANDERS
                JULIA M. WILLIAMS

6

7

             *Brian J. Robbins* w/permission DDS
                BRIAN J. ROBBINS

8

                600 B Street, Suite 1900

9

                San Diego, CA 92101
                Telephone: (619) 525-3990

10

                Facsimile: (619) 525-3991
                brobbins@robbinsarroyo.com

11

                csmith@robbinsarroyo.com
                ssanders@robbinsarroyo.com

12

                jwilliams@robbinsarroyo.com

13

                MORGAN & MORGAN, P.A.
                PETER G. SAFIRSTEIN

14

                GEORGE PRESSLY
                28 West 44th Street, Suite 2001

15

                New York, NY 10036
                Telephone: (800) 631-6234

16

                Facsimile: (800) 381-2964
                Psaferstein@morgansecuritieslaw.com

17

                Gpressly@morgansecuritieslaw.com

18

                Attorneys for Plaintiff

19

20

21

22

23

24

25

26

27

902879

28

SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Chaile Steinberg, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _____11/11/2013_____

_____
CHAILE STEINBERG

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

CHAILE STEINBERG, Derivatively on Behalf of CORINTHIAN COLLEGES, INC.,

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

JACK D. MASSIMINO, KENNETH S. ORD, ROBERT D. BOSIC, BETH A. WILSON, PAUL R. ST. PIERRE, TERRY O. HARTSHORN, HANK ADLER, ROBERT LEE, ALICE T. KANE, JOHN M. DIONISIO, LINDA AREY SKLADANY, TIMOTHY J. SULLIVAN, et al.,

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.)
ROBBINS ARROYO LLP, 600 B Street, San Diego, California 92101; (619) 525-3990

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No     ☐ **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. §1332; Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property |  | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL PROPERTY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation |  | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV |  | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other |  |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** |  |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act |  |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations |  |
|  | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accomodations | ☐ 740 Railway Labor Act |  |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act |  |
|  |  |  | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation |  |
|  |  |  | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act |  |

**FOR OFFICE USE ONLY:**     Case Number:     **SACV13-01797 RNB**

CV-71 (09/13)     CIVIL COVER SHEET     Page 1 of 3

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court?<br><br>☐ Yes  ☒ No<br><br>If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action?<br><br>☐ Yes  ☒ No<br><br>If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | A PLAINTIFF?<br><br>Then check the box below for the county in which the majority of DEFENDANTS reside. | A DEFENDANT?<br><br>Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| | ☐ Los Angeles | ☐ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? | A.<br>Los Angeles County | B.<br>Ventura, Santa Barbara, or San Luis Obispo Counties | C.<br>Orange County | D.<br>Riverside or San Bernardino Counties | E.<br>Outside the Central District of California | F.<br>Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| Indicate the location in which a majority of defendants reside: | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of claims arose: | ☐ | ☐ | ☒ | ☐ | ☐ | ☐ |

**C.1. Is either of the following true? If so, check the one that applies:**

☒ 2 or more answers in Column C

☐ only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2. Is either of the following true? If so, check the one that applies:**

☐ 2 or more answers in Column D

☐ only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D, below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | SOUTHERN |

**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ NO  ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☐ NO  ☒ YES

If yes, list case number(s):  Erickson v. Corinthian Colleges, Inc., et al., No. 2:13-cv-074660GHK-PJW

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☒ A. Arise from the same or closely related transactions, happenings, or events; or

☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):**  *Brian J. Robbins (permission DDS)*   DATE: November 14, 2013

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |